IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

     v.                                                                    20-MJ-1010

BRANDON KIDDER,

                      Defendant.
_____

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR RELEASE FROM PRETRIAL DETENTION

The United States of America by and through its attorney, James P. Kennedy, Jr., United States Attorney for the Western District of New York, and the undersigned Assistant United States Attorney, hereby files this response to defendant's motion for release from pretrial detention.

### BACKGROUND AND PROCEDURAL HISTORY

On March 6, 2020, defendant made his initial appearance before this Court and charged by criminal complaint with possession and receipt of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B), 2252A(b)(2), and 2252A(a)(2)(A). *See* Docket No. 2. Indeed, defendant's conduct involved the possession and receipt of extraordinarily violent, depraved child sexual abuse material. As such, the government moved for detention and, after hearing argument from both parties,[1] the Court granted the government's motion. *See* Docket No. 3. In addition, and pursuant to the defendant's request for a competency evaluation, on March

---

[1] On March 10, 2020, defense counsel submitted an affidavit in support of defendant's release. *See* Docket No. 5.

17, 2020, the Court ordered the defendant to undergo a psychiatric examination.[2]  *See* Docket No. 10.  On April 27, 2020, defendant filed a motion for release from pretrial detention based on COVID-19.  *See* Docket No. 14.  In response, Pretrial Services recommended defendant's continued detention stating that "[w]e do find there are no conditions or combination of conditions to reasonably assure the defendant's appearance in Court or the safety of the community."  For all the reasons stated below, the government agrees.

## ARGUMENT

I. **THE COURT SHOULD DENY DEFENDANT'S MOTION FOR RELEASE PURSUANT TO 18 U.S.C. 3142(i).**

18 U.S.C. § 3142(i) provides for pretrial release where the defendant demonstrates compelling circumstances.  This provision "has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." *United States v. Hamilton*, 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020).  Indeed, "[u]ntil recently, there was a relative paucity of case law construing for us what would constitute a "compelling reason" justifying the temporary release of a previously detained defendant." *United States v. McIntyre*, No. 19-CR-95, 2020 WL 1891837 at *9-10 (M.D. Pa. Apr. 16, 2020).  Of late, however, a rising tide of case law has construed the meaning and reach of § 3142(i) in the context of continuing custody decisions in the age of coronavirus.  *Id.*; *see also United States v. Lee*, No. 19-CR-298, 2020 WL 1541049 (D.D.C. Mar. 30, 2020).

The Court in *McIntyre*, in denying defendant's Motion for Temporary Release based upon a COVID-19 claim, stated that the standard, which required showing some "compelling

---

[2] On March 13, 2020, defendant filed an affidavit stating that he intends to raise an insanity defense. Accordingly, the government moved pursuant to 18 U.S.C. 4242(a) to have the defendant evaluated for a determination of the existence of any insanity or mental defect at the time of the offence.  The Psychiatric Evaluation Order encompasses both a competency assessment and insanity evaluation. *See* Docket Nos. 6, 10.

2

reason to warrant temporary release… must meet exacting standards." *McIntyre*, No. 19-CR-95, 2020 WL 1891837 at *9-10.  The few courts that have granted temporary release have done "only sparingly."[3]  *Id.*  Furthermore, the determination of whether there is a compelling reason justifying temporary release is an individualized judgment.

Cases construing § 3142(i) generally "have rejected emergency motions for release of otherwise healthy and potentially violent defendants based solely on the generalized risks that COVID-19 admittedly creates for all members of our society."  *United States v. Lee*, No. 19-CR-298 (KBJ), 2020 WL 1541049, at *6 (D.D.C. Mar. 30, 2020) (citing *United States v. Cox*, No. 19-cr-271, 2020 WL 1491180 (D. Nev. Mar. 27, 2020)); *United States v. Green*, No. 19-cr-304, 2020 WL 1477679 (M.D. Fla. Mar. 26, 2020); *United States v. Steward*, No. 20- cr-52, 2020 WL 1468005 (S.D.N.Y. Mar. 26, 2020); *United States v. Hamilton*, No. 19-cr-54, 2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020); *see also United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020).

"Although concerns regarding the COVID-19 pandemic may, in certain circumstances, warrant temporary release pursuant to this provision, courts in this District have been clear that this pandemic does not justify ignoring the provisions of the Bail Reform Act."  *United States v. Cooper*, No. 18-CR-00126-EAW (March 30, 2020); *see also United States v. Rollins*, 2020 WL 1482323 (W.D.N.Y. Mar. 27, 2020) ("As serious as it is, the outbreak of COVID19 simply does not override the statutory detention provisions . . . . In the absence of

---

[3] For example, release of a defendant is permitted under § 3142(i) when that defendant is suffering from a terminal illness or serious injuries. *See, e.g., United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993) (permitting release of defendant suffering from terminal AIDS that could no longer be managed by correctional authorities); *see also United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002) (permitting release where defendant sustained "serious" and "grotesque" gunshot wounds, suffered a heart attack, underwent an emergency tracheotomy, was partially paralyzed, could not use his hands, and had open and infected wounds about his body, and where the United States Marshal's Service reused to take custody of him until his wounds closed).

3

evidence demonstrating a change in circumstances concerning Rollins's status as a flight risk and danger to another person or the community, detention pending sentence must be maintained.").

"The existence of the present pandemic, without more, is not tantamount to a 'get out of jail free' card." *United States v. Williams*, 2020 WL 1434130 (D. Md. Mar. 24, 2020). In assessing temporary release due to the pandemic pursuant to 18 U.S.C. § 3142(i), "the risk of exposure, actual exposure, or contracting the virus, is just one factor to be considered and weighed against the other factors under the Bail Reform Act, including previous findings of danger to the community and risk of flight." *United States v. Veras*, No. 3:19-CR-010, 2020 WL 1675975, at *4 (M.D. Pa. Apr. 6, 2020). Moreover, "[t]he mere presence of the virus, even in the detention setting, does not automatically translate to the release of a person accused." *Id.* (citing *United States v. Williams*, 2020 WL 1643662, at *2 (D. Md. Apr. 2, 2020) (denying defendant's motion even where at least five inmates have tested positive for COVID-19 and defendant suffers from allergies and asthma)).

### A. THE COURT CORRECTLY HELD THAT DEFENDANT SHOULD BE DETAINED PENDING TRIAL.

The Bail Reform Act provides that, where there is probable cause to believe that the defendant committed certain enumerated offenses, "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3). To determine whether the defendant has rebutted the presumptions of dangerousness and flight, the Court must consider four factors: (1) the nature and circumstances of the crime charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the

nature and seriousness of the danger to the community or to an individual that the defendant's release would present.  18 U.S.C. § 3142(g).

Defendant's receipt of the violent, depraved child sexual abuse material, as alleged extensively in the sealed complaint, falls within the ambit of 18 U.S.C. § 3142(e)(3).  *See* 18 U.S.C. § 3142(e)(3)(E).  Each horrific image constitutes an individual crime scene, representing the literal and figurative ruin of a helpless child's life.  This is particularly true with respect to the extreme material defendant viewed — including, but not limited to — "rape, fighting, wrestling, bondage, spanking, pain, mutilation, gore, dead bodies, and etc. (no limits)."  *See* Docket No. 2.

Pursuant to 18 U.S.C. § 3142(g), the defendant has not and cannot rebut the presumption.  With respect to the first factor — the nature of the crime charged — defendant is charged with several serious sex offenses for which he faces a significant term of incarceration, including a mandatory minimum time of incarceration.  *See* 18 U.S.C. §§ 2252A(a)(5)(B), 2252A(b)(2), 2252A(a)(2)(A).  Regarding the second factor, the strength of the evidence against the defendant is very strong.  During a non-custodial interview with law enforcement, the defendant admitted that he received and possessed the violent child sexual abuse material described in the complaint and that he masturbated to the child sexual abuse material.  In addition, law enforcement seized various devices from defendant during the execution of a federal search warrant.  Forensic analysis of the devices revealed violent child sexual abuse material.

In addition, the defendant's history and characteristics weigh in favor of detention.  The defendant has been unemployed for five years, having been fired from his previous employment after a dispute with other employees.  The defendant has been diagnosed with

schizophrenia and is currently undergoing a competency and insanity assessment pursuant to Court order. Prior to his arrest, defendant possessed at least four guns and his mother described him as an "avid National Rifle Association (NRA) enthusiast."

Finally, defendant's release poses a serious risk to the community. This defendant received and possessed extraordinarily violent sexual abuse material. These materials included, *inter alia*, heinous depictions of violence towards the world's most vulnerable and helpless — newborn babies (including one whose umbilical cord had recently fallen off). Put simply, this is a deeply troubled man who not only has a sexual interest in children —but an incredibly violent sexual interest children. If he were released, there is nothing stopping him from acting on his horrific interests. This is particularly true where defendant suffers from a significant mental health disease, faces a mandatory minimum time of imprisonment, and previously possessed multiple firearms.

### B. DEFENDANT HAS NOT OFFERED A "COMPELLING REASON" NOR HAS HE MET THE EXACTING STANDARD REQUIRED TO MERIT HIS RELEASE.

Defendant relies on the ongoing COVID-19 pandemic to justify his temporary release. *See* Docket No. 14. Without more, defendant asserts that "[t]he United States has been hit by this pandemic for COVID 19 which creates a change in circumstances from when the Court initially determined that pre-trial detention was appropriate. The Court has a compelling reason, the health and welfare of the defendant, Brandon Kidder to allow his release with conditions." *Id* at 3. But defendant's motion fails to establish a compelling reason, or meet the exacting standard required by 18 U.S.C. § 3142(i), meriting his release.

1. **Defendant Has Not Established His Alleged Medical Condition Constitutes a Compelling Reason**.

Defendant has not shown that his alleged medical condition is a serious condition warranting release. Instead, the defendant summarily states that he "suffers from a mitral valve prolapse that is a condition of the heart that causes a murmur." Docket No. 14 at 3. He then cites to the Mayo Clinic stating that "MVP occurs when the leaflets of the mitralv[*sic*] valve bulge into the hearts[*sic*] left upper chamber (left atrium) like a parachute contraction." *Id.* He then states, without any support (legal or medical), that "COVID-19 pandemic is deadly to individuals with pre-existing conditions such as defendant, Brandon Kidder." *Id.* Defendant provides no information regarding his alleged condition and its connection, if any, to COVID-19. This alone is reason enough to deny his motion. *See, e.g.*, *United States v. Wright*, No. CR 16-214-04, 2020 WL 1976828, at *5 (W.D. La. Apr. 24, 2020) ("As to Wright's health, he suffers from ITP and had two cardiac procedures performed eleven years ago. In support of his motion, Wright does little more than define ITP for the Court. He has provided no explanation of how ITP impacts him on a daily basis; to what extent, if any, his immune system is compromised by this disease; what medications, if any, Wright takes on a daily basis to control this disease; what limitations are imposed by this disease; or whether the CDC's guidance includes ITP as a serious underlying condition worthy of the high-risk classification. Thus, Wright has failed to prove that his ITP constitutes a compelling and extraordinary circumstance.").

The defendant is correct that COVID-19 can be more serious for individuals with *certain* underlying health conditions. The CDC, however, has not specified his is one of them. Rather, publicly available medical literature ubiquitously states that MVP is rarely a serious condition. *See, e.g.*, Cedars Sinai ("MVP usually doesn't need to be treated because it is rarely

7

a serious condition, and it doesn't damage the heart."); University of Rochester Medical Center ("MVP usually doesn't need to be treated because it is rarely a serious condition, and it doesn't damage the heart. Regular checkups with your doctor are advised."); Johns Hopkins ("Treatment is not usually necessary as Mitral Valve Prolapse is rarely a serious condition. Regular checkups with a doctor are advised.").

Here, as in *Wright*, we do not know how MVP impacts defendant on a daily basis; to what extent, if any, his immune system is compromised by MVP; what medications, if any, defendant takes on a daily basis to control MVP; what limitations, if any, are imposed by MVP; or whether the CDC's guidance includes MVP as a serious underlying condition worthy of the high-risk classification. Put simply, defendant's assertions that he faces a greater risk because of his health condition is speculative and generalized.

At least one other court has denied release predicated upon the existence of a heart murmur and its potential complications under COVID-19. In *United States v. Penaloza*, No. CR TDC 19-238, 2020 WL 1555064, at *3 (D. Md. Apr. 1, 2020), the defendant asserted that he received treatment for a heart murmur on three different occasions. The defendant, similar to the defendant here, however, did not indicate "when said treatment occurred, what said treatment may be consisted of, or why he contends that he is at an increased risk of serious illness if exposed to the virus." *Id.* Because the defendant offered no expert opinion on the issue and, similar to here, "[p]ublicly available medical literature repeatedly indicates that not all heart murmurs are the same, and many are lifetime conditions never requiring medical intervention," the court denied defendant's motion for release holding that "Court requires more than the mere speculation here about Mr. Penaloza's exposure and/or vulnerability." *Id.* The same is true here.

8

2. **Defendant Has Not Demonstrated That The Conditions at Northeastern Ohio Correctional Center Are a Compelling Reason Meriting His Release.**

Defendant wholly fails to address the conditions at Northeastern Ohio Correctional Center ("NEOCC"). Rather, he relies solely on a brief generalization regarding COVID-19 and its spread in the country to support his position. *See* Docket No. 14 at 3. At the time defendant filed his motion for release, he was being housed at NEOCC. As of May 13, 2020, NEOCC has five staff members who have tested positive for COVID-19. There are zero reported cases of inmates with COVID-19, although four inmates were awaiting results. The facility has also implemented robust procedures, which are consistent with the CDC's guidance for correctional and detention facilities. Nor does the defendant contend that he did not receive or could not receive adequate treatment at the NEOCC.

CoreCivic, the operator of NEOCC, has outlined its own Pandemic Coronavirus plan. *See* CoreCivic Pandemic Coronavirus Plan, attached hereto as **EXHIBIT 1**; *see also* NEOCC Quarantine COVID-19 Cohort Unit Procedure, attached hereto as **EXHIBIT 2.** The plan includes information on symptoms, prevention and treatment, surveillance, and infection control. Moreover, CoreCivic provided the following information in connection with its response to COVID-19, stating:

> Since coronavirus was first detected in the United States, we have taken extra steps to inform and educate everyone in our facilities about prevention measures such as: regular hand washing, covering coughs and sneezes, and not touching one's eyes, mouth or nose. We are working closely with our government partners to coordinate our efforts, and we have taken significant steps to ensure we are well supplied, trained and prepared to manage COVID-19.[4]

---

[4] https://www.corecivic.com/en/corecivic-statement-on-covid-19-prevention

CoreCivic has further stated, in connection with implementation of current guidelines in response to COVID-19 at its facilities, stating:

> Implemented current guidelines from the CDC and World Health Organization for COVID-19 at all CoreCivic facilities:
>
> - Revised policies and procedures to include best practices for the prevention and handling of novel coronavirus;
> - Purchased COVID-19 testing kits;
> - Communicated best practices for personal hygiene to prevent the spread of the disease;
> - Urged employees to stay home if they are ill and expanded PTO policies for sick employees or those caring for ill family members;
> - Developed plan to separate high-risk individuals in our care who are more susceptible to COVID-19;
> - Worked closely with our government partners to suspend visitation at facilities as necessary;
> - Secured additional stores of personal protective equipment.

CoreCivic further provides on the website, in its Statement on COVID-19 Prevention, stating:

> CoreCivic is working hard to protect our employees, those entrusted to our care, and our communities during the COVID-19 pandemic. We have a Coronavirus Medical Action Plan in place at each of our facilities, which we've been working on since January. This plan includes:
>
> - Having medical staff participate in the intake process to identify those who are deemed high-risk of being infected with or contracting COVID-19;
> - Isolating those who are deemed high-risk; and
> - Working with local and state health departments to conduct appropriate testing.
>
> All of our facilities are actively promoting the following three health habits for inmates, detainees and residents, as well as staff: regular hand hygiene, respiratory etiquette (coughing or sneezing into a sleeve or tissue), and avoiding touching one's face.
>
> **Our health services administrators cooperate fully with local and state health departments, and our protocols mirror local, state and federal recommendations**.
>
> We have asked all our employees to help prevent the spread of COVID-19 and other respiratory diseases by adhering to the following recommendations:

10

- Avoid close contact with people who are sick.
- Avoid touching your eyes, nose and mouth with unwashed hands.
- Stay home when you are sick.
- Cover your cough or sneeze with a tissue, then throw the tissue in the trash.
- Clean and disinfect frequently touched objects and surfaces using a regular household cleaning spray or wipe.
- Follow the CDC's recommendations for using a facemask (medical professionals).
- Wash your hands often with soap and water for at least 20 seconds, especially after going to the bathroom; before eating and after blowing your nose, coughing or sneezing.

Based on the foregoing, measures have been adopted and set in place to protect Defendant and the community, given COVID-19. As stated by CoreCivic, "[o]ur health services administrators cooperate fully with local and state health departments and our protocols mirror local, state, and federal recommendations," and thus contrary to defendant's claim, CoreCivic has set in place ample measures to deal with the COVID-19 pandemic. The safety of the community and Defendant are being protected by the measures set forth.

Judge Skretny recently addressed a similar motion with respect to a defendant housed at NEOCC in *United States v. Correa-Castro*, No. 10-CR-185S, 2020 WL 2059734, at *2 (W.D.N.Y. Apr. 29, 2020). There, defendant moved for release from NEOCC pending sentencing. The court denied the motion holding that "[defendant] fails to demonstrate that he has a condition that puts him at increased risk of contracting the virus or that the Northeast Ohio Correctional Center is unwilling or unable to take necessary precautions to prevent the spread of the virus or to treat those who may have contracted it." *Id.* The same is true here.

### C. RELEASING DEFENDANT WOULD PLACE AN UNDUE AND UNNECESSARY BURDEN ON PROBATION AND PRETRIAL SERVICES OFFICERS.

Even if defendant met the demanding standard required by 18 U.S.C. § 3142(i), his release would place an undue and unnecessary burden and danger on probation and pretrial services officers. In support of his motion, defendant offers the same list of proposed release conditions as he did at his detention hearing. The Court found those conditions insufficient then – and should find them even more so now. Despite stating that the defendant "would be safer if released from pre-trial detention," defendant makes no effort to explain how he would be safer. He asserts that he would stay "sheltered in place at that address except medical appointments and legal/court proceedings," and that he would have "[n]o visitors except his mother Darlene Kidder, his brother Jeremy Kidder or his father Larry Kidder." Docket No. 14 at 4. He does not state whether any of those individuals have tested positive for COVID-19, tested positive for the COVID-19 antibodies, or encountered anyone with COVID-19 — or how he would prevent these individuals from contracting COVID-19 in the future. Defendant's proposed solution to his pre-trial detention references no safeguards regarding his potential exposure to COVID-19. Indeed, it is apparent that NEOCC offers a safer, more controlled environment managed by medical professionals rather the unknown risks he faces living with family members.

Moreover, while defendant argues that his release will reduce his risk of contracting COVID-19, defendant fails to acknowledge the increased risk his release would pose to Probation and Pretrial Services Officers. Supervising officers will have to conduct an intake interview, visit a home or homes, and monitor defendant's release. This will require them to enter the community and have regular interactions with defendant and others at a time when

New York State is under stay-at-home orders.  Given the strict protocols put in place by the U.S. Marshals and NEOCC, there is no reason to believe releasing defendant would reduce his exposure to COVID-19.  His release *would*, however, increase the exposure of supervising officers to COVID-19.

Courts across the country have found that the increased burden to monitor high-risk prisoners on home detention during this national crisis, as well as the likely risk to law enforcement who would have to take a non-compliant home detainee back into custody, also weigh in favor of denying motions for temporary release.  *See, e.g.*, *United States v. Morale*, No. 5:19-CR-741, 2020 WL 1984900, at *3 (N.D. Ohio Apr. 27, 2020) ("Courts have found that the increased burden on pretrial services to monitor high-risk prisoners on home detention during this national crisis, as well as the likely risk to law enforcement who would have to take a non-compliant home detainee back into custody, also weigh in favor of denying motions for temporary release."); *United States v. Deshields*, No. 1:19-CR-00099, 2020 WL 2025377, at *6 (M.D. Pa. Apr. 27, 2020) ("The fact that a probation officer might be at risk in effectuating a defendant's release on location monitoring may not, standing alone, be a reason not to release a defendant.  But in a situation in which the defendant presents both a risk of non-appearance and a danger to the community, and where that defendant is not at significantly higher risk for severe illness if infected, and where the defendant's release plan is short on details, the court must include in the balance of factors whether the risk to the probation officer is warranted." (internal quotation marks and citation omitted)); *United States v. Rowe-Hodges*, No. 417CR00175ALMCAN, 2020 WL 1969217, at *3 (E.D. Tex. Apr. 14, 2020) ("It also does not allay concerns for the safety of pretrial services officers who will have to install equipment in order to supervise him, and the United States Deputy Marshals who

13

will have to go out and find and arrest him if he does not comply with any conditions of release, in the midst of the current pandemic.").

## CONCLUSION

The defendant has not established a compelling reason meriting his release pursuant to 18 U.S.C. § 1342(i).  At bottom, his assertions are speculative and generalized and fall far short of the exacting standard required by 18 U.S.C. § 3142(i).  Because defendant presents a risk of flight and danger to the community, the Court should deny his motion for release, consistent with Pretrial Services's recommendation.

DATED:  Buffalo, New York, May 14, 2020.

        JAMES P. KENNEDY, JR.
        United States Attorney

        ***S/ CAITLIN M. HIGGINS***

By:    _____
        CAITLIN M. HIGGINS
        Assistant U.S. Attorney
        United States Attorney's Office
        Western District of New York
        138 Delaware Avenue
        Buffalo, New York 14202
        (716) 843-5818
        Caitlin.Higgins@usdoj.gov